# Exhibit 1

US008959146B2

(12) **United States Patent**
**Shkedi**

(10) **Patent No.: US 8,959,146 B2**
(45) **Date of Patent: *Feb. 17, 2015**

(54) **MEDIA PROPERTIES SELECTION METHOD AND SYSTEM BASED ON EXPECTED PROFIT FROM PROFILE-BASED AD DELIVERY**

(71) Applicant: **AlmondNet, Inc.**, New York, NY (US)

(72) Inventor: **Roy Shkedi**, Forest Hills, NY (US)

(73) Assignee: **Almondnet, Inc.**, New York, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/201,494**

(22) Filed: **Mar. 7, 2014**

(65) **Prior Publication Data**

US 2014/0188600 A1 Jul. 3, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 13/491,454, filed on Jun. 7, 2012, now Pat. No. 8,671,139, which is a continuation of application No. 12/823,709, filed on Jun. 25, 2010, now Pat. No. 8,204,783, which is a

(Continued)

(51) **Int. Cl.**
***G06F 15/16*** (2006.01)
***G06Q 30/02*** (2012.01)

(52) **U.S. Cl.**
CPC ............ ***G06Q 30/0249*** (2013.01); ***G06Q 30/02*** (2013.01); ***G06Q 30/0241*** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ....................... G06Q 30/0269; G06Q 30/0249
USPC ................. 709/203; 705/14.49, 14.51, 14.52, 705/14.53, 14.73, 14.48, 14.66, 26.41
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,710,884 A 1/1998 Dedrick
5,717,923 A 2/1998 Dedrick

(Continued)

FOREIGN PATENT DOCUMENTS

KR 10-2001-0096343 11/2001
KR 10-2004-0099222 11/2004

(Continued)

OTHER PUBLICATIONS

Engage Technologies, Inc.; Form S-1A; filed with the SEC; pp. 36-50; Jul. 19, 1999.

(Continued)

*Primary Examiner* — Kostas Katsikis
(74) *Attorney, Agent, or Firm* — Louis J. Hoffman; David S. Alavi

(57) **ABSTRACT**

An automatic system facilitates selection of media properties on which to display an advertisement, responsive to a profile collected on a first media property, where a behavioral-targeting company calculates expected profit for an ad correlated with the profile and arranges for the visitor to be tagged with a tag readable by the selected media property. The profit can be calculated by deducting, from the revenues that are expected to be generated from an ad delivered based on the collected profile, at least the price of ad space at a media property where the BT company might like to deliver ads to the profiled visitor. When the calculated profit is positive (i.e., not a loss), the BT company arranges for the visitor to be tagged with a tag readable by the selected media property through which the BT company expects to profit.

**24 Claims, 3 Drawing Sheets**



**Related U.S. Application Data**

continuation of application No. 11/763,286, filed on Jun. 14, 2007, now Pat. No. 7,747,745.

(60) Provisional application No. 60/804,937, filed on Jun. 16, 2006, provisional application No. 60/805,119, filed on Jun. 19, 2006.

(52) **U.S. Cl.**
CPC ........ ***G06Q30/0242*** (2013.01); ***G06Q 30/0246*** (2013.01); ***G06Q 30/0247*** (2013.01); ***G06Q 30/0255*** (2013.01); ***G06Q 30/0269*** (2013.01); ***G06Q 30/0277*** (2013.01)
USPC ....................................... **709/203**; 705/14.66

(56) **References Cited**

U.S. PATENT DOCUMENTS


5,724,521 A 3/1998 Dedrick
5,752,238 A 5/1998 Dedrick
5,794,210 A 8/1998 Goldhaber et al.
5,855,008 A 12/1998 Goldhaber et al.
5,918,014 A 6/1999 Robinson
5,948,061 A 9/1999 Merriman et al.
6,026,368 A 2/2000 Brown et al.
6,055,513 A 4/2000 Katz et al.
6,073,241 A 6/2000 Rosenberg et al.
6,141,010 A 10/2000 Hoyle
6,216,129 B1 4/2001 Eldering
6,285,987 B1 9/2001 Roth et al.
6,285,991 B1 9/2001 Powar
6,324,519 B1 11/2001 Eldering
6,366,298 B1 4/2002 Haitsuka et al.
6,377,986 B1 4/2002 Philyaw et al.
6,385,592 B1 5/2002 Angles et al.
6,484,492 B2 11/2002 Meholic et al.
6,487,538 B1 11/2002 Gupta et al.
6,615,247 B1 9/2003 Murphy
6,832,207 B1 12/2004 Shkedi
6,868,392 B1 3/2005 Ogasawara
6,925,440 B1 8/2005 Shkedi
6,973,436 B1 12/2005 Shkedi
6,983,379 B1 1/2006 Spalink et al.
7,039,594 B1 5/2006 Gersting
7,043,531 B1 5/2006 Seibel et al.
7,058,593 B1 6/2006 Merritt
7,065,550 B2 6/2006 Raghunandan
7,072,853 B2 7/2006 Shkedi
7,155,508 B2 12/2006 Sankuratripati et al.
7,181,438 B1 2/2007 Szabo
7,188,076 B2 3/2007 Bensemana
7,194,424 B2 3/2007 Greer et al.
7,428,493 B2 * 9/2008 Shkedi ........................... 705/35
7,454,364 B2 11/2008 Shkedi
7,558,795 B2 7/2009 Malik et al.
7,756,744 B2 7/2010 Schiff et al.
7,822,637 B2 10/2010 Shkedi
7,822,639 B2 10/2010 Shkedi
7,861,260 B2 12/2010 Shkedi
7,890,609 B2 2/2011 Shkedi
7,979,307 B2 7/2011 Shkedi
8,036,929 B1 10/2011 Reisman
8,051,444 B2 11/2011 Shkedi
8,239,264 B2 8/2012 Shkedi
8,244,574 B2 8/2012 Shkedi
8,244,582 B2 8/2012 Shkedi
8,244,583 B2 8/2012 Shkedi
8,244,586 B2 8/2012 Shkedi
8,280,758 B2 10/2012 Shkedi
8,281,336 B2 10/2012 Shkedi
8,364,540 B2 * 1/2013 Soroca et al. ............. 705/14.64
8,494,904 B2 7/2013 Shkedi
8,566,164 B2 10/2013 Shkedi
8,589,210 B2 11/2013 Shkedi
8,595,069 B2 11/2013 Shkedi
8,600,815 B2 12/2013 Shkedi
8,607,267 B2 12/2013 Shkedi
8,677,398 B2 3/2014 Shkedi
2001/0020242 A1 9/2001 Gupta et al.
2001/0039515 A1 11/2001 Mayadas
2001/0044743 A1 11/2001 McKinley et al.
2002/0002541 A1 1/2002 Williams
2002/0072965 A1 6/2002 Merriman et al.
2002/0072971 A1 6/2002 DeBusk et al.
2002/0082910 A1 6/2002 Kontogouris
2002/0082923 A1 6/2002 Merriman et al.
2002/0091568 A1 7/2002 Kraft et al.
2002/0099603 A1 7/2002 Bandura
2002/0112013 A1 8/2002 Walsh
2002/0123928 A1 9/2002 Eldering et al.
2002/0133399 A1 9/2002 Main
2002/0143632 A1 10/2002 Walter et al.
2002/0161636 A1 10/2002 Takahashi et al.
2002/0194058 A1 12/2002 Eldering
2003/0028451 A1 2/2003 Ananian
2003/0036944 A1 2/2003 Lesandrini et al.
2003/0046156 A1 3/2003 Cromer et al.
2003/0050827 A1 3/2003 Hennessey
2003/0065558 A1 4/2003 Shaw et al.
2003/0083931 A1 5/2003 Lang
2003/0083938 A1 5/2003 Smith et al.
2003/0110497 A1 6/2003 Yassin et al.
2003/0135413 A1 7/2003 Nishi et al.
2003/0135853 A1 7/2003 Goldman et al.
2003/0149938 A1 8/2003 McElfresh et al.
2003/0154126 A1 8/2003 Gehlot et al.
2003/0171990 A1 9/2003 Rao et al.
2003/0208404 A1 11/2003 Michie
2003/0220837 A1 11/2003 Asayama
2004/0024632 A1 2/2004 Perry
2004/0059632 A1 3/2004 Kang et al.
2004/0068436 A1 4/2004 Boubek et al.
2004/0117322 A1 6/2004 Bjorksten et al.
2004/0193488 A1 * 9/2004 Khoo et al. .................... 705/14
2004/0260605 A1 12/2004 McIntyre et al.
2005/0010472 A1 1/2005 Quatse et al.
2005/0021397 A1 1/2005 Cui et al.
2005/0028188 A1 2/2005 Latona et al.
2005/0038698 A1 2/2005 Lukose et al.
2005/0038702 A1 2/2005 Merriman et al.
2005/0080772 A1 4/2005 Bem
2005/0086112 A1 4/2005 Shkedi
2005/0120091 A1 6/2005 Casais
2005/0131762 A1 * 6/2005 Bharat et al. .................. 705/14
2005/0165644 A1 7/2005 Beyda et al.
2005/0216336 A1 9/2005 Roberts et al.
2005/0216823 A1 9/2005 Petersen et al.
2005/0222905 A1 10/2005 Wills
2005/0278443 A1 12/2005 Winner et al.
2006/0020508 A1 1/2006 Gorti et al.
2006/0020510 A1 1/2006 Vest
2006/0053047 A1 3/2006 Garcia et al.
2006/0064351 A1 3/2006 Hamor et al.
2006/0069614 A1 3/2006 Agarwal et al.
2006/0095322 A1 5/2006 Dierks
2006/0106710 A1 5/2006 Meek et al.
2006/0116924 A1 6/2006 Angles et al.
2006/0122879 A1 6/2006 O'Kelley
2006/0161553 A1 7/2006 Woo
2006/0183467 A1 8/2006 Stewart
2006/0212350 A1 9/2006 Ellis et al.
2006/0224496 A1 10/2006 Sandholm et al.
2006/0282327 A1 * 12/2006 Neal et al. ...................... 705/14
2007/0027850 A1 2/2007 Chan et al.
2007/0027901 A1 2/2007 Chan et al.
2007/0038516 A1 2/2007 Apple et al.
2007/0067297 A1 3/2007 Kublickis
2007/0121843 A1 5/2007 Atazky et al.
2007/0157228 A1 7/2007 Bayer et al.
2007/0179845 A1 * 8/2007 Jain ................................ 705/14
2007/0198385 A1 8/2007 McGill et al.
2007/0203794 A1 8/2007 Hajdukiewicz et al.
2007/0214048 A1 9/2007 Chan et al.
2009/0049468 A1 2/2009 Shkedi
2009/0106100 A1 4/2009 Mashinsky

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2009/0172723 | A1 | 7/2009 | Shkedi et al. | |
| 2009/0281954 | A1 * | 11/2009 | Waelbroeck et al. | 705/80 |
| 2010/0268605 | A1 * | 10/2010 | Waelbroeck et al. | 705/14.53 |
| 2010/0293057 | A1 * | 11/2010 | Haveliwala et al. | 705/14.66 |
| 2011/0258049 | A1 * | 10/2011 | Ramer et al. | 705/14.66 |
| 2012/0209705 | A1 * | 8/2012 | Ramer et al. | 705/14.51 |
| 2012/0209706 | A1 * | 8/2012 | Ramer et al. | 705/14.51 |
| 2012/0209707 | A1 * | 8/2012 | Ramer et al. | 705/14.51 |
| 2012/0209708 | A1 * | 8/2012 | Ramer et al. | 705/14.51 |
| 2012/0209709 | A1 * | 8/2012 | Ramer et al. | 705/14.51 |
| 2012/0209710 | A1 * | 8/2012 | Ramer et al. | 705/14.51 |
| 2012/0215635 | A1 * | 8/2012 | Ramer et al. | 705/14.51 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | 2004/084109 | 9/2004 |
| WO | 2005/046237 | 5/2005 |

OTHER PUBLICATIONS

The e-Marketing Report; Morgan Stanley Dean Whitter; May 2000; portions.

"ClickOver, Inc. introduces ClickWise, the first inteligent, high-performance ad management system for electronic advertising", Business Wire; Mar. 24, 1997.

* cited by examiner


Receive profile information
1000
Determine anticipated profit
2000
Select media properties that will produce a profit
3000
Arrange storage of tag
4000

FIG. 1


Receive redirected computer and visitor profile information
100
Recognize action conducted on site
200
Categorize action (optional)
300
Calculate expected revenue
400
Select media properties for ad based on profit determination
500

FIG. 2


20
FIRST MEDIA PROPERTY/ PROFILE SUPPLIER (E.G., SITE SERVER)
10
12
11
USER/VISITOR COMPUTER
t1
t2
SECOND MEDIA PROPERTY "A" (E.G., SITE SERVER)
41
40
110
710
730
700
100
610
INTERNET (OR OTHER MEDIA)
80
620
720
630
50
SECOND MEDIA PROPERTY "B" (AD NETWORK SERVER)
30
31
BT COMPANY SERVER
60
AD SPACE ON SITE 1
61
AD SPACE ON SITE 2

FIG. 3

# MEDIA PROPERTIES SELECTION METHOD AND SYSTEM BASED ON EXPECTED PROFIT FROM PROFILE-BASED AD DELIVERY

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of application Ser. No. 13/491,454, filed Jun. 7, 2012, now U.S. Pat. No. 8,671,139, which is a continuation of application Ser. No. 12/823,709, filed Jun. 25, 2010, now U.S. Pat. No. 8,204,783, which is a continuation of application Ser. No. 11/763,286, filed Jun. 14, 2007, now U.S. Pat. No. 7,747,745, which claims the benefit of provisional application Ser. No. 60/804,937, filed Jun. 16, 2006, and provisional application Ser. No. 60/805,119, filed Jun. 19, 2006, which are herein incorporated by reference.

## FIELD OF THE INVENTION

The present invention generally relates to profile-based behavioral targeting advertisement placement methods. More specifically, the present invention relates to electronic advertisement placement based on expected profit from the placement.

## BACKGROUND OF THE INVENTION

DoubleClick's "Boomerang" is a service for advertisers that places a cookie on computers of visitors to an advertiser's site for the purpose of finding those visitors on other sites where DoubleClick is the ad server ("ad" is short for advertisement). When the same visitors are found on those other sites, additional advertiser's ads are served to them by the DoubleClick ad sever or by the advertiser's ad server following a redirect from the DoubleClick ad server.

The only server that can read a cookie on a user's computer is a server operating under the same domain as the server that placed the cookie on a user's computer to begin with. In other words, a cookie placed by a server operating under one domain cannot be read by another server working under a separate domain. That is why the advertiser cannot expect to place a cookie of its own (e.g., ford.com cookie) on a visitor to its site and then later expect the DoubleClick ad server (doubleclick.com) to be able to recognize the visitor when that visitor is visiting sites where DoubleClick serves ads by reading the ford.com cookies. Only a server operating under the DoubleClick domain can read a cookie placed by a server operating under the DoubleClick domain. So, DoubleClick needs to place a doubleclick.com cookie on visitors to the ford.com site for DoubleClick to later find those visitors within other sites, i.e., where the DoubleClick ad server is used to serve ads.

For a site to have its ad served by an ASP-hosted ad server, such as the one operated by DoubleClick, the site needs to redirect visitors from the site to the DoubleClick ad server, to fetch the ad from the server. Following the redirect from the site, the visitor accesses the DoubleClick ad server. Because the DoubleClick server is operating under the DoubleClick domain, it can read the DoubleClick cookie or cookies and then recognize that it encountered the same visitor in the past. In this example, the DoubleClick ad server recognizes the visitor as someone who visited the ford.com site.

AlmondNet, Tacoda, RevenueScience, and other companies (herein "BT companies"; "BT" stands for behavioral targeting) specialize in targeting ads based on observed behavior of sites' visitors. BT companies place a cookie (or



cookies) on the computers of visitors to specific sections of a publisher's website or on the computers of visitors of the publisher who conducted a specific action such as search, click content, click an ad, request information, acquire a product, etc.

The placement of cookies allows those publishers or the BT company itself to sell ads to advertisers. Those ads will be presented to the visitors when they are found later on the same site or on other sites. Such sites can be either a site where the BT company's software is used or a site where the BT company has bought media. The BT company may buy the media on behalf of itself or on behalf of the publisher, who is interested in delivering ads to its audience outside the publisher's site.

Although a BT company (AlmondNet, Tacoda, Revenue-Science, etc.) acts as an agent that places cookies on the computers of publisher's visitors for the purpose of delivering targeted ads to the publisher's visitors on other sites, the publisher can work without an agent and place cookies or tags on the computers of the publisher's own visitors for the purpose of delivering ads to those visitors on other sites where the publisher buys ad space. Such a publisher, acting without an agent, is also included in the definition of a BT company.

A publisher may also be referred to as a "profile supplier" when it transfers profile information, such as behavioral information, demographic information, etc., to a BT company. Therefore, a publisher that is a BT company may also be its own profile supplier. Furthermore, although the name "BT company" implies the targeting of ads is based on collected behavioral profiles, a BT company may also collect other kinds of profile information, such as demographic information or user-provided information, and target ads to those visitors wherever found based on the collected profile information.

Another kind of a BT company is a company that has software installed on a person's computer, such as toolbar software, desktop search software, weather software, or any kind of software that is used by the computer's user. Such software also monitors the computer user's visits to different publishers' sites and media properties and collects profile information about the computer user for the purpose of delivering ads to the user within ad space of sites and media properties that the user visits based on the collected profiles.

A BT company using software installed on a user's computer does not need the cooperation of a visited media property to collect information about the visitor's visit because that software monitors whatever the user is doing on his or her computer. A BT company that has software installed on a user's computer is therefore its own profile supplier. Such software can place a cookie or another kind of tag on the user's computer. Because the software is installed on the user's computer, it can write cookies readable by any domain. That means that the BT company can place a tag or cookie of a second media property, if the BT company would like the second media property to recognize the visitor when the visitor visits that second media property site, by simply having the software place a cookie operating under the domain of the second property on the visitor's computer. The software may also report the collected profiles to a central server of the BT company.

The central server may also tag the visitor or arrange for the visitor to be tagged by operators of other media properties. A BT company can place a cookie on a site's section when a visitor's computer visits that section, if a code of the company was integrated into the page of that section by the site that owns the page. The code (e.g., HTML or Java) redirects to the BT company's server all visitors to the page. Also, in the case

that the BT company is the publisher itself, the publisher will simply "cookie" (by itself) all visitors that either read a specific content, search, click, ask for information, make a phone call, etc.

The BT company's server, which either gave the site a unique code for a page, received from the page its URL, or received access to the page's content that could be analyzed by the BT company's server, etc., identifies the content read by the page's visitor or the keyword searched for by the user, or an ad clicked on the page, etc. The content read by the page visitor could be identified by the BT company's server whether the content was reported by the site or whether the content was identified following the analysis of the page. The server then places a cookie on the user's computer indicating what content was read by the visitor on the page, what keyword was searched for by the user, or what ad was clicked on the page, etc. The placed cookie indicates that information (1) in the cookie per se, (2) in a central database operated by the server where the cookie ID is used as a record finder, or (3) both in the cookie and in the database.

Although the above description relates to cookies, a cookie is only one example of a possible tag. A tag generally is a unique identifier used to mark a person electronically visiting a media property, such as a web site, TV channel, radio show, or the like, using a computer, a mobile device, a TV set, a TV set top box, or any other device.

The tag is used for the purpose of delivering additional ads to a visitor to one media property when that visitor is found later on other media properties, based on the visitor's profile collected on the first media property. The profile could be the observed behavior of the visitor on the media property, demographic information collected on the media property, profile information provided by the visitor to the media property, etc.

Because the purpose of the tag is to enable the delivery of additional ads on other media properties visited by the visitor, and because the delivery of an ad requires only control of the ad space and not necessarily control of the entire media property visited by the visitor, a media property (in the present context) can also be defined as any equipment that controls an ad space viewed by a visitor, including a web site, an ad network's site (where the ad network represents the ad space of different sites), a TV program, some of the ad space within TV programs or TV channels (represented by a cable company), a TV network, or any ad space for which an entity is allowed to sell an advertisement and deliver it within the ad space; whether the ad space is owned by that entity, or whether the entity pays the owner of the ad space when using its ad space to deliver an ad sold by the entity. Ad space can be on a web site, in a TV program, in a text message, in a radio show, in any broadcasted material, in any streaming video or audio, etc. An ad space can be a fixed position on a page, or the ad space can be made available by a web site to an ad network (for example) only when the web site did not sell all of the site's ad inventory and therefore wishes to make some of the inventory available to the ad network.

In the case of a media property controlling an ad space viewed by a visitor, a specific ad space on a page might be controlled only temporarily. For example, in the case of the web site that did not sell all the ad impressions available to be delivered within an ad space on a page and therefore makes the unsold ad space available to the ad network to fill, the ad network will have temporary control of the ad space, i.e., when that ad space is given to it by the web site. Once the site redirects the ad space on the page to the ad network (so the ad network could fill the ad space with an ad sold by the ad network), the ad network controls the ad space and has access to the visitor viewing the ad space that was redirected to the ad network by the site, and therefore the ad network's equipment is considered a media property, as it controls an ad space viewed by a visitor.



The tag can be placed on the device used by the user to access the first media property where the user's profile was collected (in case of observed behavior, that behavior can be reading a specific content, searching, clicking an ad or content, making a phone call, asking for product information, acquiring a product, or taking any other kind of action). A tag placed on the device (1) could be read only by a server operating under the same domain as the server that placed the tag on the device to begin with as in the case of a cookie for example, (2) could be placed on the device when the user visited the first media property, and then the tag can be read by any second media property visited by the visitor, or (3) could be encrypted and, while accessed by any second media property visited by the visitor, the tag could be deciphered only by second media property computers that received the deciphering code from the first media property. In case of a tag placed by software installed on a user's computer, the tag could be whatever the software wants it to be, including a cookie of any domain.

A tag does not have to be placed on the user's device. A tag can also be used in a central database of a BT company or a central database of any second media property visited by the visitor, where the tag could be a unique identifier either of the device or of the user. In the case where the tag identifies the device, the tag might denote an IP address, a phone number, a device's manufacturer serial number, etc. A cookie placed on the device can also uniquely identify the device and the cookie therefore can be used as a tag in a central database. In the case where the tag identifies the user, the tag might denote the username and password used to access a media property, a user's name and address, a user's e-mail, a user's social security number, or any other personal identifiable information.

As already mentioned, the observed behavior of a visitor to a first media property is referred to as profile information about a specific visitor. A visitor's profile might be enhanced by the visitors' observed behavior on other media properties or by other profile information collected on other media properties.

A visitor's profile can be represented by a unique tag, or the profile can be stored with the tag, whether the tag is placed on the device, on a central database, or both. For example, the profile can be stored within a cookie (tag) on a visitor's device, or the profile can be stored in a central database where the tag connected to the profile is used as a unique identifier of the visitor's device or of the visitor personally. The profile can also be saved on both the device and a central database.

One of the major challenges in targeting a first site visitor on another site with an ad based on his observed behavior on sites visited by him previously (such as the first site) is actually finding the visitor on other sites.

Depending on the tag placed (or arranged to be placed) by the BT companies, the visitor could be recognized either by the entity that placed the tag to begin with (which requires access by that entity to the tag when the visitor visits a second media property) or by the second media property reading the tag (in which case the tag can be placed by the second media property if the BT company so arranges).

BT companies, acting as an agent, can find visitors tagged by them, when the tagged visitors are present on sites that use the BT companies' software (either to serve ads or in conjunction with those sites' ad servers). BT companies (whether it is acting as an agent, is the publisher itself, or is operating

with any other BT company) can find visitors tagged by them, when the visitors are present on sites and ad networks where the BT companies buy media.

To make the process of finding people who visited a first media property on other media properties more efficient, BT companies enable sites and ad networks (from whom the BT companies buy media) to also place their cookies on the computers of people (visitors) on whose computers the BT company has placed its own cookie. That technique is similar to the way DoubleClick's Boomerang system places cookies on visitors to an advertiser site for the purpose of finding those visitors later on other sites where Doubleclick serves ads.

An ad network ad server (or any other server of the ad network) or a site's ad server (or any other server of the site) can place their own cookies on the computers of visitors that are redirected to them by the BT companies, for the purpose of later recognizing those visitors within their own ad space (i.e., the ad space of the ad networks or the sites).

This process—where sites and ad networks place cookies on visitors' computers redirected to them by BT companies (or other entities interested in additional ads presented to their audience elsewhere)—is sometimes referred to as "cookie matching."

For example, weather.com might place a weather.com cookie on a user's computer marking him or her as a visitor to BT company #1, following a redirect from BT company #1 server. Later, if and when the weather.com ad server recognizes that the same visitor (previously redirected to him by BT company #1) happened to visit weather.com (weather.com will recognize the visitor by reading its own weather.com cookie, which marked the visitor as a BT company #1 visitor), the weather.com ad server can, if it wishes, redirect the visitor's computer to the BT company #1 server, to have an ad served to the visitor, either by BT company #1's ad server or another ad server to which BT company #1 ad server further redirects the visitor. The weather.com ad server's decision, whether or not to redirect the visitor's computer to BT company #1's server can be based on the price that BT company #1 promised to pay weather.com for the presentation of an ad within weather.com's ad space, to a visitor previously redirected to weather.com by BT company #1's server.

Although the above-described processes enable a second media property to recognize a first media property visitor, it is still a very inefficient process for the following reasons:

(1) Media properties' ad space prices vary.

(2) Profiles of media properties' visitors are worth different amounts to advertisers depending on the profiles. For example, a person who searched for a "mortgage" on a search engine might be presented with a mortgage-related ad, for which the advertiser is willing to pay $3 if that person clicks on that ad. A person who searched for "socks" on a search engine might be presented with a socks-related ad, for which the advertiser is willing to pay $0.50 if that person clicks on that ad. A person who visited the mutual fund section of a site might be presented with a mutual-fund related ad (wherever the person is found, i.e., either on the same site or on other sites), in which case the advertiser is willing to pay $25 for every thousand ads (CPM) presented to people who visited that mutual fund section.

(3) The same person might have several profile attributes in his or her profile (as a result, for example, of that person conducting several different searches and visiting different sites). Different advertisers might be willing to pay different amounts for delivering ads to the person based on the specific profile attribute or attributes that the respective advertisers are looking to target.

In summary, the cost of ad space at a second media property might not be covered by revenues generated for a BT company buying the space, i.e., from an ad delivered within the second media property ad space based on a profile collected in a first media property or properties. Alternatively, the revenues might cover the media cost but not deliver satisfactory margins to the BT company, when taking into account other costs, such as ad sales people cost, ad serving cost etc.

## SUMMARY OF THE INVENTION

According to various aspects of the invention, therefore, an automatic system is described to facilitate selection of media properties on which to display an advertisement, responsive to a profile collected on a first media property, where a BT company calculates expected profit for an ad correlated with the profile and arranges for the visitor to be tagged with a tag readable by the selected media property.

The profit can be calculated by deducting, from the revenues that are expected to be generated from an ad delivered based on the collected profile, at least the price of ad space at a media property where the BT company might like to deliver ads to the profiled visitor. When the calculated profit is positive (i.e., not a loss), the BT company arranges for the visitor to be tagged with a tag readable by the selected media property through which the BT company expects to profit.

The above summary does not include an exhaustive list of all aspects of the present invention, Indeed, the inventor contemplates that the invention may include all systems and methods that can be practices from all suitable combinations of the various aspects summarized above, as well as those disclosed in the detailed description below and particularly pointed out in the claims filed with the application. Such combinations have particular advantages not specifically recited in the above summary.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a flow diagram of an exemplary embodiment of a profit-based selection method.

FIG. **2** is a flow diagram of an exemplary embodiment of a profit-based selection method.

FIG. **3** is a schematic of an exemplary embodiment of entities and associated equipment used with a profit-based selection method.

## DESCRIPTION OF PREFERRED EXEMPLARY EMBODIMENTS

Referring to the embodiment of FIG. **1**, responsive to receiving (**1000**) profile information (e.g., actions) of an electronic visitor with respect to a first media property, the instant method includes (i) determining (**2000**) anticipated revenues and/or profit resulting from placing an advertisement targeted to the visitor based on the received profile, and (ii) automatically selecting (**3000**) at least one media property for which it is anticipated that there will be a positive profit in delivering an ad to the profiled visitor. The method includes, via an electronic communications media, for each of the selected media properties, arranging (**4000**) for electronic storage of a tag readable by said media property, wherein the tag is associated with the visitor.

Profit can be defined as:

(1) revenues expected to be generated, from an ad delivered based on the collected profile, minus the ad space cost at a specific media property (i.e., Pr=Rev(profile)−P (mp), where "Pr" is profit, "Rev" is revenue generated from advertising to

a visitor with a particular profile, and "P" is the price charged by media property "mp" for advertising in an ad space);

(2) revenues expected to be generated, from an ad delivered based on the collected profile, minus the sum of (a) the price for buying ad space on the specific media property, (b) ad serving cost, (c) ad sales associated cost, and (d) desired profit margin (i.e., Pr=Rev(profile)−P(mp)−C−Mar, where "C" represents costs and "Mar" represents desired profit margin), or

(3) in other ways.

If the calculated profit indicates that the BT company will lose (negative profit) from delivering an ad, based on the received profile on any of the possible media properties where it is buying ad space, the BT company won't arrange for the visitor to be tagged by a tag readable by any of those media properties, and the BT company might even decide not to collect the profile (so the visitor's profile will not be stored).

Using the equation defining profit in item (2) just above, the question of whether the profit is positive or negative, as stated in this paragraph, equates to testing (4) whether Rev(profile)−P(mp)−C−Mar>0, which is the same as (5) whether Rev(profile)−P(mp)−C>Mar, or (6) whether Rev(profile)>P(mp)+C+Mar, or (7) whether P(mp)<Rev(profile)−C−Mar. Grouping the terms on the right-hand side of the equation in item (7) reduces that equation to the same as testing whether the price charged by a media property is less than a price cap, with the price cap being defined as the difference determined by subtracting from the revenue generated from advertising to a visitor with a particular profile a selected amount, here defined by the costs and desired profit margin.

Likewise, using the equation defining profit in item (1) just above, the question of whether the profit is positive or negative equates to testing (8) whether Rev(profile)−P(mp)>0, which equates to testing (9) whether P(mp)<Rev(profile), which again is the same as testing whether the price charged by a media property is less than a price cap, with the price cap being defined in this instance simply as the available revenue generated from advertising to a visitor with a particular profile.

The method includes the following basic steps, shown in FIGS. **2** and **3**:

1. A profile supplier **20** redirects (**100**) a visitor **10** to a BT company **30** along with the visitor's profile. In case the profile supplier **20** is also the BT company **30**, this step either does not take place or takes place internally, for example via an internal redirect from one server to another server operating under the same domain that belongs to the publisher/BT Company. In case the BT company **30** has software on a user's computer **11** that enables it to monitor the user's visits to media properties (e.g., **20**, **40**, **50**) without the cooperation of the media properties, this step either does not take place or takes place internally, e.g., by the software on the user's computer communicating the collected profile to the BT company's central server.

2. The BT company **30** recognizes (**200**) the content read by the user **10**, the category to which the content read by the user **10** belongs, the keyword searched for by the user **10**, an ad clicked by the user **10**, or any other action conducted on the page/site **20** by the user **10** (such as click on an item of content or an ad, purchase of a product, request for more information, etc) during the site visit (**110**). The recognizing might be as simple as pulling a keyword for which the visitor **10** searched from a URL used by the profile supplier **20** to redirect the visitor **10** to the BT company **30**, for example.

3. The BT company **30** optionally can categorize (**300**) specific content read by the user **10**, or an action conducted by a user **10**. An example action might be a search for a keyword. To illustrate, suppose a person searched for an airline ticket to Florida on a travel site. When the BT company **30** receives that information, in addition to recording the search for the flight to Florida in the visitor's profile (whether the profile is stored in the cookie or tag, the BT company's central database **31**, or both of those places), the BT company **30** may further categorize the person under the "Travel" category and in the "Search for Flights" subcategory of "Travel."

4. The BT company **30** calculates (**400**) expected revenues from delivering ads based on the collected profile (Rev(profile) in the equations above). The revenues are calculated based on the kind of collected profile: (a) Expected revenues from content read by the visitor **10** can be calculated by checking, for example, how much advertisers are willing to pay for delivering ads to visitors who read specific content. (b) Expected revenues from delivering ads based on a keyword searched by the visitor **10** can be calculated by checking, for example, how much advertisers are willing to pay for each click on an ad related to the keyword for which the visitor searched and multiplying that price per click by an assumed click-through rate on ads related to the searched-for keyword, up to 14 days after the visitor's search. In general, expected revenues can be calculated for the delivery of ads based on a category of content read by the visitor **10**, for specific content read by the visitor **10**, or for action taken by the visitor **10** (e.g., made a phone call, clicked an ad, clicked specific content, asked for information, acquired product, etc.).

5. The BT company **30** selects (**500**) media properties (e.g., **40**) for the delivery of an advertisement based on a profile collected on a first media property **20**. The BT company **30** makes the selection based on a calculated expected profit and then arranges for the visitor **10** to be tagged (**610** or **620**) with a tag readable by the selected media property **40**. The profit is calculated in any of the alternative manners stated above.

The BT company's arranging placement of the tag can be achieved in different ways:

A. The BT company **30** can redirect (**630**) a visitor to the selected media property **40**, **50** with a request to have the selected media property **40**, **50** tag (**620**) the visitor with the media property's own tag, which obviously is readable by the selected media property **40**, **50** (such a tag could be a cookie on the visitor's storage device **12**).

B. The BT company **30** can itself place (**610**) a tag that will be readable by the selected media property **40**.

C. The BT company **30** can place an encoded tag that, although accessible by any media property (e.g., **40**, **50**), can be read only by a selected media property **40** to which the BT company gave a deciphering code.

D. In cases when the BT company **30** has software installed on a user's computer **10**, the BT company **30** can arrange for the software to place (not shown) a tag readable by the selected media property **40** (such a tag could be a cookie operating under the selected media property domain).

E. The BT company **30** can arrange for the selected media property **40** to place a tag in the selected media property's central database **41**, in which case the tag can uniquely identify (1) the device **11** that the visitor **10** will use to access the selected media (IP address, set-top box ID, mobile phone number, manufacturer serial number, cookie readable by the selected media property, etc.), or (2) the user as a person (personal identifiable information).

When a selected media property **40** recognizes a tagged visitor **10** (tagged previously, at time t1) later (at time t2) visiting (**710**) its ad space, the media property **40** will arrange for the BT company **30** to serve an ad (**720**) to the visitor **10**

(which will appear with the media content (**730**) requested by the visitor), by redirecting (**700**) a visitor to the BT company **30**, for example.

The media properties can be of the same kind of media (e.g., two web sites **40**, **60** on the Internet **80**) or of different media (e.g., first media property can be a web site **40** on the Internet **80**, and the second media property can be a TV channel on TV or a text message system on a mobile phone, etc.). In the case (not shown) where the second media property operates within a different media than the first media, the tagging of the visitor with a tag readable by the second media property (which is arranged by the BT company **30**) might include finding the device used by the visitor **10** to access the second media by using personal identifiable information about the visitor **10**. As there may be no connection between the device used by the visitor to access the first media property (computer **11**, for example) and the device used by the visitor to access the second media property (TV, for example) besides the commonality of the user (visitor) **10**, personal identifiable information about the visitor **10** could be used to allow the second media property to learn which device the visitor **10** uses to access the second media property and tag the visitor **10**. The second media property could tag the device used by the visitor **10** to access the second media property by placing a tag on the device itself or in a central database of the second media property, for example).

Although the BT company **30** stores the visitor's collected profile, in the above-described implementation it does not transfer the collected profile to the second media property **40**, **50** but simply asks the second media property **40**, **50** to tag the visitor as a BT company visitor or arrange for a tag to be placed (**620**) that is readable by the second media property **40** and that marks the visitor as a BT company visitor. As the BT company **30** buys ad space from the proprietor of the second media property **40** and delivers therein an ad based on the collected profile, the BT company **30** has no economic incentive to transfer the profile information itself (such as the fact that the visitor searched for "car insurance") to the second media property **40**. The second media company's proprietor is being paid for the ad space and therefore just needs to know that the visitor **10** has been profiled by the BT company **30**, which will pay the second media property's proprietor for an opportunity to deliver an ad to this visitor **10** within the ad space of the second media property **40**.

Suppose, for example, a person searches for "mortgage" on Google (Google is a BT company **30** in this example). Using the method above, Google calculates that advertisers are willing to pay $3 per click on a mortgage-related ad, that the expected click-through on a mortgage-related ad is 0.3%, and therefore Google will earn $9 for every thousand mortgage-related ads delivered to people that searched for "mortgage" on Google when those people are found later, anywhere on the web (i.e., this is "Rev(profile)"). Google further knows that it costs Google $3 CPM to deliver a thousand ads on weather.com (i.e., "P(mp)") to computers that were tagged by weather.com as Google visitors. Google therefore can calculate a profit of $6 CPM (without taking into account other costs, i.e., "C") for delivering a thousand mortgage-related ads to Google visitors who searched for "mortgage" on Google when found later within the ad space of weather.com. Google will therefore arrange for weather.com to tag the person who searched for "mortgage" on Google as a Google visitor (by redirecting the visitor to weather.com with the request to tag the person as a Google visitor, for example).

In the case where a second media property controls ad space with prices that fall within a range, the BT company **30**—in addition to arranging for the second media property (e.g., **50**) to tag (**620**) its visitor—may also provide the second media property **50** with the price the BT company **30** is willing to pay the second media property **50** for delivering an ad within the second media property's ad space. In FIG. **3**, second media property **50** is shown as an ad network's site (where the ad network represents the ad space of different sites, **60**, **61**), as described above. The price delivered from the BT company **30** enables the second media property **50** to determine which ad space it should allocate to the BT company **30** when the tagged visitor **10** visits the second media property **50**. Although some of the ad space (e.g., on site **60**) might be too expensive, i.e., above the cap defined by the price the BT company **30** is willing to pay, other ad space (e.g., on site **61**) might have a cost that would be covered by the price the BT company **30** is willing to pay. However, obviously, the BT company **30** will not arrange for tag placement if the price it is willing to pay for delivering an ad to the profiled visitor **10** is less than the lowest price demanded by a second media property **50** for delivering an ad within that ad space, i.e., price cap<min[P(mp)].



Given that some kind of profiles such as behavioral profiles are time-sensitive (in other words, their value diminishes with time), the BT company **30**—in addition to arranging the placement of a tag readable by the second media property **40**, **50**—may also provide the second media property **40**, **50** (via the tag, for example) with a time period within which the BT company **30** will agree to deliver ads to the profiled visitor **10** within the ad space of the second media property **40**, **50**. Suppose, for example, a BT company **30** collected a profile of a visitor **10** who searched for "flowers." The BT company **30** might arrange for the visitor **10** to be tagged with a tag, readable by a second media property **40**, marking the visitor **10** as the BT company's visitor and setting a time limit of two days, which means that the second media property **40** can call upon the BT company **30** to serve an ad to the tagged visitor **10** only when the visitor **10** is found within the second media property's ad space up to two days after the visitor **10** was tagged (the tag may have a time stamp identifying the date and time the tag was placed to help the second media property **40** calculate the date before which the second media property **40** can call upon the BT company **30** to serve an ad).

The calculation that takes place in steps 4 and 5 of the above-described method may take place not at the time of profile collection as described above but beforehand. Conducting the calculation before the profile is collected can shorten the time it takes the server **30** to select the media properties. The calculation might be done beforehand for other reasons.

Specifically, step 4 (which states that the BT company **30** calculates the expected revenues from delivering ads based on the collected profile, where the revenues are calculated based on the kind of collected profile, i.e., "Rev(profile)") may take place in advance. If for example, a collected profile describes the content read by a visitor, then, if other profiles were previously collected of the same kind of profile, there is no need to check how much advertisers are willing to pay for delivering ads, as it was already checked for profiles of the same kind.

The word "calculating" expected revenues can encompass a scenario in which there are no arithmetic calculations, but rather simply an act of locating the correct information. In this example, the information concerning how much advertisers are willing to pay for delivering their ads to visitors **10** that read a specific content is located, and no arithmetic calculation is needed.

For another example, if the expected revenues for delivering an ad for someone who searched for "mortgage" has

recently been calculated, then there is no need to calculate it again, and the information can simply be located.

Although the examples describe calculation of revenues from delivering an ad at a media property **40**, **50**, depending on the method of payment for the media property, different calculations of expected revenues can take place.

If the media property only gets paid for when a visitor visiting it takes action, then the revenues per profile-based ad delivery should also be based on an action. Such a visitor action can be a click on an ad, a request for information from the advertiser (following a click on the ad), a registration with the advertiser, an act of buying a product or service from the advertiser, etc.

For example, if the media property **40** is paid at the rate of $0.40 per click on an ad presented to the media property's visitor, the BT company **30** will check how much the advertiser will pay the BT company **30** per visitor click when viewing an ad based on the collected profile. If the price per click paid by the advertiser at least exceeds the price per click paid for the media property, then the BT company **30** can arrange for the tagging of the visitor **10** with a tag readable by the selected media property (the one that will cost $0.40 per click).

In some scenarios, the BT company **30** might be paid for every ad delivered to a visitor, but the media property might trigger payment for every visitor click on an ad. Conversely, the BT company **30** might be paid for a visitor click on an ad, but the media property might trigger payment for every delivered ad regardless of whether a click took place or not. In those scenarios, so as not to expose itself to the risk of loss, the BT company **30** preferably translates the payment it receives (whether per ad delivery or ad click or per action) to the payment method applied to the media property. For example, if the BT company **30** is paid $0.25 per click on an ad by a visitor who searched for a "DVD" but a media property triggers payment for every ad delivery at $0.50 CPM (regardless of whether a click took place), the BT company **30** can translate the payment per click it receives to payment for ad delivery. In this example, the BT company **30** can calculate that, with an expected click-through of 0.4% on DVD-related ads by people who searched for "DVD" up to seven days before they are presented with an ad, the BT company **30** will generate $1 CPM (0.4% CTR*1,000 ads*$0.25 per click=$1), i.e., Rev(profile)~$1 CPM. Because $1 CPM is more than the $0.50 cost of the media property (i.e., Rev(profile)>P(mp)), the BT company **30** will make a gross profit of $0.50 CPM and therefore (assuming costs are low or ignored) arrange for tag placement.

Likewise with respect to step 5 (which states that the BT company **30** selects media properties for delivery of an advertisement based on a profile collected on a first media property where the selection is made by the BT company **30** based on a calculated expected profit), the calculation on which the media property selection is based could be a calculation done beforehand. If the collected profile is of the same kind as another profile that was collected recently (for example, both profiles describe "searching for flights") then the information concerning how much revenues would be generated from such a profile is already available, and there is no need to recalculate. Also, the profit has also been calculated, because the cost of ad space at the different media properties probably does not change in a short period of time. A look-up table can be used that lists, based on the kind of profile, the media properties that should be selected. In such a scenario, the steps of the method will be:

1. The BT company **30** calculates expected revenues from delivering ads based on different collected profiles.

2. The BT company **30** calculates expected profits (or losses) for the delivery of ads based on different collected profiles within the ad space of different available media properties **40**, **50**.

3. The BT company **30** builds a table wherein each kind of profile is assigned media properties where ads will be delivered based on the profile, and wherein the selection of media properties is made based on the previously calculated profit. The table is updated on a regular basis to make sure it is up to date.

4. The BT company **30** collects a profile.

5. The BT company **30** arranges for placement of a tag readable by a selected media property, where the selected media properties are taken from the table described in step 3 above.

The above is just one possible implementation. Instead of a table, a database or any other data structure can be used. The calculation could be done entirely in advance, entirely when the profile is collected, or a combination wherein some of the calculation is done in advance and some when the profile is collected.

Accordingly, the method can be described in the following more general steps:

1. The BT company **30** collects a profile.

2. The BT company **30** arranges (**610**, **620**) for a tag (readable by a selected media property **40**, **50**, or both) to be placed, where the media property is selected based on the expected profit from the delivery of an ad (**720**) based on the collected profile within the ad space of the media property.

Although the above method focuses on profit calculation that takes into account expected revenues from delivery of an ad based on a collected profile, media property ad space cost and other costs, other parameters beyond costs and revenues might be taken into account. For example, an advertiser might insist that its ads appear on media properties that have certain content and not on other media properties, a media property might not agree to show ads from a certain category (for example, a sports media property might not agree to show sports-related ads, to avoid promoting competitors), etc.

## PUBLIC NOTICE REGARDING THE SCOPE OF THE INVENTION AND CLAIMS

The inventor considers various elements of the aspects and methods recited in the claims filed with the application as advantageous, perhaps even critical to certain implementations of the invention. However, the inventor regards no particular element as being "essential," except as set forth expressly in any particular claim.

Although the invention has been described in terms of preferred embodiments and generally associated methods, the inventor contemplates that alterations and permutations of the preferred embodiments and methods will become apparent to those skilled in the art upon a reading of the specification and a study of the drawings.

I claim:

**1**. A method of directing electronic advertisements, performed by a computer system comprised of one or more computers, the method comprising:

for each of a multitude of different electronic visitors to a first media property:

(a) automatically with the computer system directing, to a third-party server computer controlling advertising space on a second media property, indicia of a condition, which condition relates specifically to an elec-

tronic visitor, for display of an advertisement to the electronic visitor when the electronic visitor visits the second media property at a time after the electronic visitor visits the first media property, subject to determining that the condition has been met;

(b) wherein directing the indicia is based on information indicating to the computer system that at least one of a plurality of profile attributes is possibly applicable to the electronic visitor, which indicated profile attribute or attributes was received by the computer system as a result of the electronic visitor visiting the first media property; and

(c) wherein the advertisement is correlated with the indicated profile attribute or attributes.

**2**. The method of claim **1** wherein the condition for display of the advertisement is that a price charged by the second media property is less than a profile-attribute-dependent price that an advertiser is willing to pay for display of the advertisement.

**3**. The method of claim **1** wherein the condition is a specified time period after receiving profile-attribute information about the electronic visitor.

**4**. The method of claim **1** further comprising building a look-up data structure associating at least one selected of a plurality of possible profile attributes with at least one selected of a plurality of second media properties, and wherein the method comprises sending the condition to the server computers controlling advertising space on those selected second media properties using the lookup data structure associated with the profile-attribute information received about the electronic visitor.

**5**. The method of claim **1** wherein directing the indicia is performed by the computer system responsive to receiving an electronic redirect of a visitor computer accompanied by profile-attribute information about the electronic visitor.

**6**. The method of claim **1** wherein directing the indicia is performed by the computer system responsive to recognizing an action conducted on the first media property by the electronic visitor.

**7**. The method of claim **6** wherein the action is a search request by the electronic visitor on the first media property.

**8**. The method of claim **1** wherein directing the indicia is performed by the computer system responsive to receiving information about a characteristic of the electronic visitor.

**9**. The method of claim **1** further comprising categorizing the profile attribute within at least one of a plurality of predefined categories.

**10**. The method of claim **1** wherein directing the indicia comprises arranging for placement of a tag on the electronic visitor, wherein the electronic visitor is a computer, and wherein the tag is readable by the server computer.

**11**. The method of claim **10** wherein the indicia of the condition is given to the server computer at the time arranging for placement of a tag takes place.

**12**. The method of claim **11** wherein the indicia of the condition is directed by incorporating the indicia in a URL used to redirect the electronic visitor to the server computer to enable the server computer to place a tag associated with the visitor's computer.

**13**. The method of claim **10** wherein arranging for placement of a tag comprises redirecting the electronic visitor to the server computer for the server computer to place a tag on the electronic visitor readable by the server computer.

**14**. The method of claim **1** wherein directing the indicia comprises, responsive to receiving information via an electronic redirect of a visitor computer accompanied by profile-attribute information about the electronic visitor, directing the indicia by arranging for placement of a tag readable by the server computer, and wherein the condition comprises that the advertisement will be displayed only during a specified time period after receiving the information about the electronic visitor.



**15**. The method of claim **1** wherein the server computer controls ad space that is in a different medium than the medium of the first media property.

**16**. The method of claim **1** wherein the server computer controls the ad space only temporarily.

**17**. A tangible computer-server device comprising a processor and a memory and programmed to implement a method of directing electronic advertisements, the method comprising:

for each of a multitude of different electronic visitors to a first media property:

(a) automatically with the device directing, to a third-party server computer controlling advertising space on a second media property, indicia of a condition, which condition relates specifically to an electronic visitor, for display of an advertisement to an electronic visitor when the electronic visitor visits the second media property at a time after the electronic visitor visits the first media property, subject to determining that the condition has been met;

(b) wherein directing the indicia is based on information indicating to the computer server device that at least one of a plurality of profile attributes is possibly applicable to the electronic visitor, which indicated profile attribute or attributes was received by the device as a result of the electronic visitor visiting the first media property; and

(c) wherein the advertisement is correlated with the indicated profile attribute or attributes.

**18**. The device of claim **17** wherein the condition for display of the advertisement is that a price charged by the second media property is less than a profile-attribute-dependent price that an advertiser is willing to pay for display of the advertisement.

**19**. The device of claim **17** wherein the device is programmed to implement a method wherein directing the indicia comprises arranging for placement of a tag on the electronic visitor, wherein the electronic visitor is a computer, and wherein the tag is readable by the server computer.

**20**. The device of claim **19** wherein the device is programmed to implement a method wherein the condition is given to the server computer at the time arranging for placement of a tag takes place by incorporating the indicia of the condition in a URL used to redirect the electronic visitor to the server computer to enable the server computer to place a tag associated with the visitor's computer.

**21**. A system comprising one or more computers programmed to implement a method of directing electronic advertisements, the method comprising:

for each of a multitude of different electronic visitors to a first media property:

(a) automatically directing, to a third-party server computer controlling advertising space on a second media property, indicia of a condition, which condition relates specifically to an electronic visitor, for display of an advertisement to an electronic visitor when the electronic visitor visits the second media property at a time after the electronic visitor visits the first media property, subject to determining that the condition has been met;

(b) wherein directing the indicia is based on information indicating to the system comprising one or more computers that at least one of a plurality of profile

attributes is possibly applicable to the electronic visitor, which indicated profile attribute or attributes was received by the system comprising one or more computers as a result of the electronic visitor visiting the first media property; and

(c) wherein the advertisement is correlated with the indicated profile attribute or attributes.

**22**. The system of claim **21** wherein the condition for display of the advertisement is that a price charged by the second media property is less than a profile-attribute-dependent price that an advertiser is willing to pay for display of the advertisement.

**23**. The system of claim **21** wherein directing the indicia comprises arranging for placement of a tag on the electronic visitor, wherein the electronic visitor is a computer, and wherein the tag is readable by the server computer.

**24**. The system of claim **23** wherein the condition is given to the server computer at the time arranging for placement of a tag takes place by incorporating the indicia of the condition in a URL used to redirect the electronic visitor to the server computer to enable the server computer to place a tag associated with the visitor's computer.

* * * * *

# EXHIBIT 2

# Exhibit 2 - U.S. Patent No. 8,959,146 ("'146 Patent")

| Claim 1 | Temu's Infringement |
|---|---|
| 1[pre]. A method of directing electronic advertisements, performed by a computer system comprised of one or more computers, the method comprising: | Temu (Whaleco Inc.) performs a method of directing electronic advertisements, performed by a computer system comprised of one or more computers that satisfies every element of claim 1, as shown below. *See, e.g.* evidence and analysis for claim limitations 1(a)-(c) below; *see also* https://www.temu.com/privacy-and-cookie-policy.html:<br><br>This Privacy Policy describes how, Whaleco Inc., a Delaware company ("Temu", "we", "us" or "our") handles personal information that we collect through our digital properties that link to this Privacy Policy, including our website (www.temu.com) and mobile application (collectively, the "Service"), and other activities as described in this Privacy Policy. At Temu, we care deeply about privacy. We strive to be transparent about our privacy practices, including how we treat your personal information. This Privacy Policy explains how we collect, use, share, and otherwise process the personal information of users in connection with our Service. If you are a resident of a U.S. state that has enacted comprehensive privacy legislation, please see our Privacy Policy Addendum for U.S. Residents for additional information. To learn more about how we handle health data, please see our Consumer Health Data Privacy Policy.<br><br>; PDD Holdings, Inc. Annual Report (Form 20-F) 1, 92 (Apr. 29, 2026) (identifying Whaleco Inc. as "the operator of the Temu platform," which PDD Holdings defines as the Temu mobile app and website):<br><br>"Temu" or "Temu platform" are to our Temu mobile app and website and a variety of related features, functionalities, tools and services that we provide to buyers and merchants via the Temu mobile app and website; [p. 1]<br>. . .<br>"In September 2025, the FTC brought an enforcement action . . . against Whaleco, Inc., the operator of the Temu platform . . ." [p.92]<br><br>; https://play.google.com/store/apps/details?id=com.einnovation.temu&hl=en_US&gl=US (Google Play listing for the Temu Android application, identifying Whaleco Inc. as the developer): |

**About the developer**

Whaleco Inc.
androidhelp@temu.com
31 Saint James Avenue
Ste 355 Boston
Massachusetts, MA 02144
United States
+1 857-227-9111

; https://apps.apple.com/us/app/temu-shop-like-a-billionaire/id1641486558 (Apple App Store listing for the Temu application, identifying Whaleco Inc. as the seller):

**Information**

| | |
|---|---|
| Seller<br>Whaleco Inc. | Category<br>Shopping |
| Compatibility<br>Requires iOS 13.0 or later. | Languages<br>English and 50 more |
| Age Rating<br>13+ | Copyright<br>© Whaleco Inc. |

; https://www.temu.com/cookie-and-similar-technologies-policy.html (Temu Cookies and Similar Technologies Policy ("Cookie Policy")):

This Cookie and Similar Technologies Policy (the "Cookie Policy") supplements the Temu Privacy Policy ("Privacy Policy") and describes how we handle personal information that we collect through our digital properties that link to this Cookie Policy, including our website (www.temu.com), and Temu's mobile application (collectively, the "Service"), and through social media, our marketing activities, and other activities as described in this Cookie Policy.

; https://www.temu.com/privacy-policy-addendum-for-us-residents.html (Temu Privacy Policy Addendum for U.S. Residents, identifying Whaleco Inc. as the contact for the U.S. Notice):

| | |
|---|---|
| | This Privacy Policy Addendum for U.S. Residents ("U.S. Notice") supplements the Temu Privacy Policy ("Privacy Policy") and the Cookies and Similar Technologies Policy and provides additional details for residents of certain U.S. states on how we collect, use and disclose Personal Information, and the rights such residents may have with respect to that Personal Information.<br><br>▸ **How to Contact Us**<br><br>Should you have any questions about our privacy practices or this U.S. Notice, please email us at privacy@temu.com or contact us by mail at the following address: Whaleco Inc., Suite 355, 31 St. James Avenue, Boston, Massachusetts 02116, USA. |
| for each of a multitude of different electronic visitors to a first media property: (a) automatically with the computer system directing, to a third-party server computer controlling advertising space on a second media property, indicia of a condition, which condition relates specifically to an electronic visitor, for display of an advertisement to the electronic visitor when the electronic visitor visits the second media property at a time after the electronic visitor visits the first media property, subject to determining that the condition has been met; | Temu performs the method step of, for each of a multitude of different electronic visitors to a first media property, automatically with the computer system directing, to a third-party server computer controlling advertising space on a second media property, indicia of a condition, which condition relates specifically to an electronic visitor, for display of an advertisement to the electronic visitor when the electronic visitor visits the second media property at a time after the electronic visitor visits the first media property, subject to determining that the condition has been met.<br><br>For example, for each of a multitude of different electronic visitors to a first media property (e.g., Temu.com or another media property from which Temu receives behavioral information used to target advertisements) Temu automatically directs to a third-party server computer (e.g., a third party publisher's ad server which selects a winning bid or deal for a given ad impression) controlling advertising space on a second media property (e.g., a website, email, or media property for which Temu submits bids to display advertisements), indicia of a condition, which condition relates specifically to an electronic visitor, for display of an advertisement. The indicia of the condition is, for example a bid or price willing to be paid for an ad space, and indicates a condition for display of an advertisement (i.e., what price the publisher ad server must accept before the advertisement may be displayed).<br><br>*See, e.g.*, https://adstransparency.google.com/advertiser/AR00931916197090295809/creative/CR11461228436782055425?region=US (Google Ads Transparency Center, "Ad details" (captured Oct. 12, |

2026) (identifying "Whaleco Inc." as the advertiser of a Temu advertisement "Shown in the United States," "Last shown: Oct 12, 2026")):



; https://databeat.io/blog/us-programmatic-trends-april-2025/ (DataBeat article reporting that among advertisers in Google's Ad Exchange (AdX) in the U.S., "TEMU claims the top position, with a CPM of $1.96"):

**Report Overview:**

The DataBeat Programmatic Trends Report for March 2025 analyzes anonymized data from industry partners within the DataBeat network, focusing on programmatic advertising trends in the U.S. This report provides a detailed comparison of March 2025's performance against both February 2025 and March 2024, offering insights into month-over-month and year-over-year changes.

5. AdX Advertisers

- Among advertisers, TEMU claims the top position, with a CPM of $1.96, with a 4.7% MoM increase.

; https://www.temu.com/cookie-and-similar-technologies-policy.html (Temu Cookie Policy naming Google and Facebook among the third parties Temu works with to serve advertisements across the Internet):

**Your Choices**

**Limit interest-based advertising**. In addition to rights you may have as described in the Privacy Policy Addendum for U.S. Residents, you can limit the use of cookies and similar technologies to process your personal information for interest-based advertising in the following ways:

- Browser settings. Block third-party cookies in your browser settings.
- Privacy browser/plugin. Allows you to block tracking technologies by using privacy browsers or ad-blocking browser plug-ins.
- Opt out of interest-based advertising (also called "targeted advertising" in our Privacy Policy Addendum for U.S. Residents). To opt-out of such sharing, click on "Your Privacy Choices" in the footer of Temu website or "Privacy" in the setting of Temu app.
- Opt out of Google Analytics Advertising Features. You can opt out of Google Analytics Advertising Features through Google Ad Settings: https://myadcenter.google.com/.
- Change Facebook ad selections. You can prevent Facebook from using your information for interest-based advertising through Facebook Ad Settings: https://www.facebook.com/about/ads.
- Do not receive interest-based advertisements from certain third-party advertising partners. You can manage your advertising preferences for some of the third parties we work with to serve advertisements across the Internet using the options available at
  - Online Advertising Initiative: https://thenai.org/opt-out/.
  - Digital Advertising Alliance: optout.aboutads.info, you can go to https://www.youradchoices.com/appchoices, and download the AppChoices mobile app, which will allow you to opt-out of interest-based ads in mobile apps served by participating members of the Digital Advertising Alliance.
  - We cannot offer any assurances as to whether the companies we work with participate in the opt-out programs described above.

; https://support.google.com/google-ads/answer/2464960?hl=en (Google Ads Help "About Manual CPC bidding'):

Help Center Topics > ... > Bidding > Bid Strategies > About Manual CPC bidding

# About Manual CPC bidding

With Manual Cost-Per-Click (CPC) bidding, you can set a maximum price on the cost of someone clicking on your ads. You can get good value with this bidding method because you pay only when a viewer is interested enough to click your ad and learn more.

## How CPC bidding works

For CPC bidding campaigns, you set a maximum cost-per-click bid - or simply "max. CPC", that's the highest amount that you're willing to pay for a click on your ad (unless you're setting bid adjustments, or using **Enhanced CPC**).

## The final amount you're charged

Your max. CPC bid is the most you'll be charged for a click, but you'll often be charged less, sometimes much less. That final amount you're charged for a click is called the **actual CPC**.

Actual CPC is often less than max. CPC because with the Google Ads auction, the most you'll pay is what's minimally required to clear the Ad Rank thresholds and beat the AdRank of the competitor with the next highest Ad Rank for a given position (if any).

## How a max. CPC bid affects your Ad Rank

In the **Search Network**, your **Ad Rank** helps determine your eligibility, and if eligible, where on the search results pages your ads are shown (if at all) relative to other advertisers' ads. If you run your ads on the **Display Network**, Ad Rank plays the same key role there. As Ad Rank is a score that's based on your max. CPC bid and the quality of your ad compared to other advertisers' ads, raising your max. CPC will probably increase your ad's chances of appearing.

; https://support.google.com/google-ads/answer/2732132?hl=en (Google Ads Help "About bid adjustments"):

| | |
|---|---|
| | ## About bid adjustments<br><br>A bid adjustment is a percentage increase or decrease in your bids. Bid adjustments allow you to show your ads more or less frequently based on where, when, and how people search.<br><br>;https://github.com/InteractiveAdvertisingBureau/openrtb/blob/main/OpenRTB%20v3.0%20FINAL.md#bidresponsepayload (providing the details of an RTB bid response):<br><br>## Bid Response Payload<br><br>The response object contains minimal high level attributes (e.g., reference to the request ID, bid currency, etc.) and an array of seat bids, each of which is a set of bids on behalf of a buyer seat.<br><br>The individual bid references the item in the request to which it pertains and buying information such as the price, a deal ID if applicable, and notification URLs. The media related to a bid is conveyed via Layer-4 domain objects (i.e., ad creative, markup) included in each bid.<br><br>**Object: Response**<br><br>This object is the bid response object under the `Openrtb` root. Its `id` attribute is a reflection of the bid request ID. The `bidid` attribute is an optional response tracking ID for bidders. If specified, it will be available for use in substitution macros placed in markup and notification URLs. At least one `Seatbid` object is required, which contains at least one `Bid` for an item. Other attributes are optional.<br><br>To express a "no-bid", the most compact option is simply to return an empty response with HTTP 204. However, if the bidder wishes to convey a reason for not bidding, a `Response` object can be returned with just a reason code in the `nbr` attribute. |

| | | | |
|---|---|---|---|
| | `tactic` | string | Tactic ID to enable buyers to label bids for reporting to the exchange the tactic through which their bid was submitted. The specific usage and meaning of the tactic ID should be communicated between buyer and exchanges beforehand. |
| | `purl` | string | Pending notice URL called by the exchange when a bid has been declared the winner within the scope of an OpenRTB compliant supply chain (i.e., there may still be non-compliant decisioning such as header bidding). Substitution macros may be included. |
| | `burl` | string; recommended | Billing notice URL called by the exchange when a winning bid becomes billable based on exchange-specific business policy (e.g., markup rendered). Substitution macros may be included. |
| | `lurl` | string | Loss notice URL called by the exchange when a bid is known to have been lost. Substitution macros may be included. Exchange-specific policy may preclude support for loss notices or the disclosure of winning clearing prices resulting in `${OPENRTB_PRICE}` macros being removed (i.e., replaced with a zero-length string). |

| | | |
|---|---|---|
| `exp` | integer | Advisory as to the number of seconds the buyer is willing to wait between auction and fulfilment. |
| `mid` | string | ID to enable media to be specified by reference if previously uploaded to the exchange rather than including it by value in the domain objects. |
| `macro` | object array | Array of `Macro` objects that enable bid specific values to be substituted into markup; especially useful for previously uploaded media referenced via the `mid` attribute. Refer to Object: Macro. |
| `media` | object | Layer-4 domain object structure that specifies the media to be presented if the bid is won conforming to the specification and version referenced in `openrtb.domainspec` and `openrtb.domainver`. For AdCOM v1.x, the objects allowed here are "Ad" and any objects subordinate thereto as specified by AdCOM. |
| `ext` | object | Optional demand source specific extensions. |

The condition relates specifically to the electronic visitor because the price is specific to a particular ad impression (e.g., an ad for gardening tools), which will be displayed to the specific electronic visitor; additionally, the price is based on a profile attribute or attributes (e.g., interest in gardening) associated with that visitor. *See, e.g.*, https://adalytics.io/blog/user-id-rotation:

In programmatic advertising, vendors utilize user IDs to build audience profiles and decide how to serve targeted ads. For example, a user with a given user ID might frequent a lot of gardening websites, and consequently, when ad tech vendors "see" that specific user ID, the vendors serve ads to that user ID from advertisers who are promoting gardening tools.

Some user IDs can elicit higher bids from ad tech vendors on behalf of media buyers. For example, a user ID that is thought to be associated with a doctor may elicit very high bid prices from DSPs which are trying to serve ads to healthcare providers on behalf of pharmaceutical brands.

; https://help.smartadserver.com/articles/Knowledge/Extended-User-Identification:

**Overview**

User identification across the inventory chain from Supply to Demand is critical to allow for targeting (audience targeting, retargeting etc.), frequency capping and other features.
Traditionally, user identification across the programmatic ecosystems is done by each player dropping a cookie with a unique user id and then synching this id with all other players in the ecosystem.
Since third party cookie based user identification is increasingly blocked by browsers, new providers and initiatives have emerged to allow for cookieless and universal user identification. This article explains Equativ's support of these providers.

**Equativ's extended Ids (eids) support**

To embrace the cookieless user identification era, Equativ follows the Extended Identifiers (eids) specification (see IAB OpenRTB 3.0 specification and IAB AdCOM v1.0 specification). Extended Ids are sometimes referred to as "alternative Ids".

At this time, Equativ supports extended Ids as follows:

- publishers can sign up with a supported user identification provider and send the user Ids in ad calls to Equativ's system; see list of supported providers below in chapter "Logging"
- Equativ logs the presence of a user Id from a supported provider in the ad call and makes it available in the Reporting API as an additional dimension; extended Id statistics are not yet available in the Equativ Monetization Platform
- Smart forwards all `eids` received in the ad calls to the DSPs in the bid requests

; https://support.google.com/google-ads/answer/2732132?hl=en (Google Ads Help "About bid adjustments"):

**Your data segments for Search ads (advanced)**

You can set bid adjustments for remarketing lists in your ad groups if you'd like to show ads to people on these lists. For example, you could increase your bid by 25% for those who previously viewed your website in the last 30 days. If you don't yet have a remarketing list set up, review About Google Ads remarketing lists for search ads.

; https://www.temu.com/privacy-policy-addendum-for-us-residents.html (Temu Privacy Policy Addendum for U.S. Residents discussing the "Sale and Sharing of Perosnal Information"):

| | |
|---|---|
| | ▸ **The Sale and Sharing of Personal Information**<br><br>Temu uses services that employ cookies and similar technologies to collect Personal Information (including certain identifiers and internet activity information described in the "Collection of Personal Information" section above) about your use of our websites and other online services over time, which helps us to deliver targeted advertisements. In addition, we may share certain categories of Personal Information described in the table of the "Processing of Personal Information" section with our advertising and analytics partners, as well as business and marketing partners with whom we collaborate on marketing events and/or promotion of the Service for targeted advertising purposes. For example, we may share identifiers including your email address and telephone number with our advertising and analytics partners (in hashed form) and business and marketing partners. Our use of some of these services may constitute the "sale" or "sharing" of Personal Information (as defined by the applicable U.S. state privacy laws) to/with third party advertisers. We do not knowingly sell or share (as defined by the applicable U.S. state privacy laws) the Personal Information of minors under 16 years of age.<br><br>; https://www.temu.com/privacy-and-cookie-policy.html#how_and_why_we_share_your_information:<br><br>▸ **How and Why We Share Your Information**<br><br>At Temu, we care deeply about privacy. While Temu shares your personal information for the purposes of targeted advertising, which may be considered a "sale" under applicable U.S. state privacy laws (as described further in the Privacy Policy Addendum for U.S. Residents), Temu does not "sell" personal information in the traditional sense. We may share your personal information with the following parties for the purposes outlined below: |

| | |
|---|---|
| | **Advertising and analytics partners**<br><br>We may share your personal information with third-party advertising, marketing, and analytics companies for the interest-based advertising and analytics purposes described in our Cookies and Similar Technologies Policy. Certain of these disclosures to third parties are known as "sharing" or processing your personal information for targeted advertising, but "sharing" may be considered "selling" your personal information under applicable laws. For additional information and to learn about your right to opt out of such practices, see the "Your Rights and Choices" section, the Privacy Policy Addendum for U.S. Residents, and the Cookies and Similar Technologies Policy.<br><br>The ad impression is displayed to the electronic visitor when the electronic visitor visits the second media property at a time after the electronic visitor visits the first media property, subject to determining that the condition has been met (e.g., whether the server computer agrees to display the advertisement for the particular price provided by Temu). *See, e.g.*, https://www.temu.com/cookie-and-similar-technologies-policy.html:<br><br>**Introduction to Cookies and Similar Technologies**<br><br>**Cookies**, which are small text files that websites store on user devices, allow web servers to record users' web browsing activity and remember their submissions, preferences, and login status as they navigate a website. Cookies used on our sites include "session cookies" that are deleted at the end of a session, "persistent cookies" that are retained for longer periods of time, "first-party" cookies that we manage, and "third-party" cookies that our third-party business partners and service providers place.<br><br>**Web beacons**, also known as pixel tags or clear GIFs, which are used to demonstrate that a webpage or email address was accessed or opened, or that certain content was viewed or clicked.<br><br>; https://www.temu.com/privacy-and-cookie-policy.html: |

| | |
|---|---|
| | **Information collected automatically**<br>To enhance your experience with the Service and support the other purposes for which we collect personal information as outlined in this Privacy Policy, we may automatically collect information about you, your computer, or mobile device and your interactions with the Service and our communications over time, such as:<br>**Device data**<br>We collect personal information about the device you use to access the Service, such as device model, operating system information, internet service provider, language settings, unique identifiers (e.g., identifiers used for advertising purposes where permitted by law). |

**Service usage information**

We collect personal information about your interactions with the Service, including the source from which you arrived at our pages, the pages you viewed, other interactions with the Service (e.g., your browsing history, searching and purchasing history), the items in your shopping cart and whether you opened our emails or clicked on the links within our emails. We also collect service-related, diagnostic, and performance information, including crash reports and performance logs.

**General location data**

We collect your approximate location data based on your technical information (e.g., IP address).

**Data collected via cookies and similar technologies**

We collect information via cookies and similar technologies stored on your device. These cookies are either necessary and required to provide our Service (for example, the cookies we use to display products relevant to your language and location) or optional (for example, the cookies used to track and measure the advertisements shown to you). To learn how to disable certain cookies, please read our Cookies and Similar Technologies Policy.

## Information from third-party sources

To the extent permitted by applicable laws, we may receive and collect your personal information from other third-party sources, such as:

**Marketing and advertising partners**

We receive and collect your personal information from our marketing and advertising partners, such as business partners with whom we collaborate on marketing events and promotion of the Service. Specifically, we receive from these partners information including, for example, the specific advertisements you clicked on, attribution information via cookies and similar technologies to help us determine the origin of traffic to our Service, device data if you clicked on certain advertisements, responses to marketing emails, advertisements and offers, and audience information from marketing partners where they have the authority to share that information with us.

## ▸ How and Why We Use Your Information

We use the personal information that we collect for various purposes, including to develop, improve, support, and provide the Service, allowing you to use its features while fulfilling and enforcing our Terms of Use. We may use your personal information for the following purposes:

| | |
|---|---|
| | **Interest-based advertising**<br><br>We, our service providers, and our third-party advertising partners may collect and use your personal information for interest-based advertising purposes. For example, we may use your interactions with the Service (e.g., your browsing, searching and purchasing history on the Service), and information included in your account profile (e.g., your country if recorded) to show you interest-based advertising on our platform, which displays a merchandise partner's listing or product more prominently. We do not use information which on its own personally identifies you, such as your name or email address, to show you interest-based advertising. In providing interest-based advertising, we follow the Self-Regulatory Principles for Online Behavioral Advertising as set forth by the Digital Advertising Alliance (DAA), which is an advocacy organization for responsible digital marketing and consumer privacy. You can learn more about interest-based advertising and your opt-out choices here.<br><br>; https://www.nbcuniversalprivacy.com/privacy/ortp (third parties to which NBCUniversal has disclosed consumer personal data to, listing TemuDSP as an "Additinoal Third Part[y]").<br><br>; https://support.google.com/admanager/answer/9012903?hl=en (Google Ad Manager including "TemuDSP" in the list of "Commonly used" "ad partners").<br><br>; https://adalytics.io/blog/user-id-rotation: |

| | |
|---|---|
| | <br>As a further example, the price condition relates specifically to the electronic visitor because the price is specific to a particular ad impression (e.g., an ad for gardening tools), which will be displayed to the specific electronic visitor; additionally the price is based on a profile attribute or attributes (e.g., interest in gardening) associated with that visitor. |
| (b) wherein directing the indicia is based on information indicating to the computer system that at least one of a plurality of profile attributes is possibly applicable to | The step of directing the indicia in part (a) is based on information indicating at least one of a plurality of profile attributes possibly applicable to the electronic visitor, which indicated profile |

| | |
|---|---|
| the electronic visitor, which indicated profile attribute or attributes was received by the computer system as a result of the electronic visitor visiting the first media property; and | attribute or attributes was received by the computer system as a result of the electronic visitor visiting the first media property.<br><br>For example, the step of directing the indicia in part (a) is based on information (e.g., user activity information / behavioral information) indicating at least one of a plurality of profile attributes possibly applicable to the electronic visitor (e.g., interest in gardening), which indicated profile attribute or attributes was received by the system comprising one or more computers (e.g., the system or systems through which Temu submits bid responses for advertising campaigns), as a result of the electronic visitor visiting the first media property from which Temu receives profile information regarding the electronic visitor (such as, e.g., which audiences the electronic visitor belongs to).<br><br>*See, e.g.*, evidence for claim limitation 1(a) above; https://www.temu.com/privacy-and-cookie-policy.html:<br><br>**Information collected automatically**<br><br>To enhance your experience with the Service and support the other purposes for which we collect personal information as outlined in this Privacy Policy, we may automatically collect information about you, your computer, or mobile device and your interactions with the Service and our communications over time, such as:<br><br>**Device data**<br><br>We collect personal information about the device you use to access the Service, such as device model, operating system information, internet service provider, language settings, unique identifiers (e.g., identifiers used for advertising purposes where permitted by law). |

| | |
|---|---|
| | **Service usage information**<br><br>We collect personal information about your interactions with the Service, including the source from which you arrived at our pages, the pages you viewed, other interactions with the Service (e.g., your browsing history, searching and purchasing history), the items in your shopping cart and whether you opened our emails or clicked on the links within our emails. We also collect service-related, diagnostic, and performance information, including crash reports and performance logs.<br><br>**General location data**<br><br>We collect your approximate location data based on your technical information (e.g., IP address).<br><br>**Data collected via cookies and similar technologies**<br><br>We collect information via cookies and similar technologies stored on your device. These cookies are either necessary and required to provide our Service (for example, the cookies we use to display products relevant to your language and location) or optional (for example, the cookies used to track and measure the advertisements shown to you). To learn how to disable certain cookies, please read our Cookies and Similar Technologies Policy.<br><br>; https://www.temu.com/privacy-policy-addendum-for-us-residents.html: |

| | |
|---|---|
| | ▸ **Collection of Personal Information**<br><br>We collect and have collected in the past twelve (12) months the following categories of Personal Information:<br><br>• **Identifiers**, such as name, postal address, telephone number, unique personal identifier (e.g., device ID), online identifier, internet protocol (IP) address, email address or other similar identifiers;<br>• **Customer Records**, such as your account and profile information and customer records that contain Personal Information, such as username, name, email, telephone number, account credentials, communications preferences, billing and payment information, customer service and support tickets and records, and other information individuals provide us in order to register for, access, or make purchases via the Service;<br>• **Customer Delivery Information**, such as your shipping address, and consignee contact information;<br>• **Commercial Information**, such as order information or purchase history;<br>• **Payment Information**, such as financial details and payment method;<br>• **Internet/ Network Activity Information**, such as browsing history, search history, and information regarding a consumer's interaction with the Service, or advertisements;<br>• **General Location**, based on IP address;<br>• **Inferences**, such as estimated advertising conversion information about your interaction with advertisements;<br>• **Audio and Video Information**, such as videos and/or audio you provide to our customer service team, and videos you provide for product reviews; and<br>• **Sensitive Personal Information**, including account log-in information, health data, contents of mail, email, and text messages.<br><br>Details of the categories of sources of Personal Information that we collect are described in the "What Information We Collect" section of our Privacy Policy. The purposes for which we use these categories of Personal Information are described further in the "How and Why We Use Your Information" section of our Privacy Policy. |

## ▸ Processing of Personal Information

The following table describes our collection, use, and disclosure of Personal Information currently and during the past twelve (12) months. Please note that the categories of Personal Information collected and the examples of information disclosed to third parties vary based on the nature of your interactions with us. For instance, Customer Delivery Information applies only to users who have made a purchase through our Service. To learn more about the categories of Personal Information that we collect, please see the "Collection of Personal Information" section above and the "What Information We Collect" section of our Privacy Policy. Details of the categories of third parties are described further in the "How and Why We Share Your Information" section of our Privacy Policy. Our relevant data retention practices are addressed in the "Data Security and Retention" section of our Privacy Policy. Additionally, we will not attempt to re-identify de-identified information that we derive from Personal Information, except for the purpose of determining whether our deidentification process satisfies legal requirements.

| Category of Personal Information | Categories of Third Parties to Whom Personal Information Has Been Disclosed for Business Purposes | Categories of Third Parties to Whom Personal Information Has Been Sold or Shared for Targeted Advertising |
|---|---|---|
| **Identifiers** | Service Providers<br>Payment Processors<br>Advertising and Analytics Partners<br>Business and Marketing Partners<br>Merchandise Partners<br>U.S. Authorities and Regulators | Advertising and Analytics Partners<br>Business and Marketing Partners |

| | | |
|---|---|---|
| **Internet/ Network Activity Information** | Service Providers<br>Advertising and Analytics Partners<br>Business and Marketing Partners<br>U.S. Authorities and Regulators | Advertising and Analytics Partners<br>Business and Marketing Partners |
| **General Location** | Service Providers<br>Advertising and Analytics Partners<br>Business and Marketing Partners<br>U.S. Authorities and Regulators | Advertising and Analytics Partners |
| **Inferences** | Advertising and Analytics Partners<br>U.S. Authorities and Regulators | Advertising and Analytics Partners |

; https://www.temu.com/privacy-policy-addendum-for-us-residents.html:

**▸ The Sale and Sharing of Personal Information**

Temu uses services that employ cookies and similar technologies to collect Personal Information (including certain identifiers and internet activity information described in the "Collection of Personal Information" section above) about your use of our websites and other online services over time, which helps us to deliver targeted advertisements. In addition, we may share certain categories of Personal Information described in the table of the "Processing of Personal Information" section with our advertising and analytics partners, as well as business and marketing partners with whom we collaborate on marketing events and/or promotion of the Service for targeted advertising purposes. For example, we may share identifiers including your email address and telephone number with our advertising and analytics partners (in hashed form) and business and marketing partners. Our use of some of these services may constitute the "sale" or "sharing" of Personal Information (as defined by the applicable U.S. state privacy laws) to/with third party advertisers. We do not knowingly sell or share (as defined by the applicable U.S. state privacy laws) the Personal Information of minors under 16 years of age.

; https://www.temu.com/privacy-and-cookie-policy.html:

## How and Why We Use Your Information

We use the personal information that we collect for various purposes, including to develop, improve, support, and provide the Service, allowing you to use its features while fulfilling and enforcing our Terms of Use. We may use your personal information for the following purposes:

**Marketing**

We and our service providers collect and use your personal information for marketing purposes in accordance with applicable laws. To the extent permitted by applicable laws, we may send you direct marketing communications, such as emails, text messages and push notifications. You may opt out of our marketing communications as described in the "Your Rights and Choices" section below.

**Interest-based advertising**

We, our service providers, and our third-party advertising partners may collect and use your personal information for interest-based advertising purposes. For example, we may use your interactions with the Service (e.g., your browsing, searching and purchasing history on the Service), and information included in your account profile (e.g., your country if recorded) to show you interest-based advertising on our platform, which displays a merchandise partner's listing or product more prominently. We do not use information which on its own personally identifies you, such as your name or email address, to show you interest-based advertising. In providing interest-based advertising, we follow the Self-Regulatory Principles for Online Behavioral Advertising as set forth by the Digital Advertising Alliance (DAA), which is an advocacy organization for responsible digital marketing and consumer privacy. You can learn more about interest-based advertising and your opt-out choices here.

; https://www.temu.com/cookie-and-similar-technologies-policy.html:

**Introduction to Cookies and Similar Technologies**

**Cookies**, which are small text files that websites store on user devices, allow web servers to record users' web browsing activity and remember their submissions, preferences, and login status as they navigate a website. Cookies used on our sites include "session cookies" that are deleted at the end of a session, "persistent cookies" that are retained for longer periods of time, "first-party" cookies that we manage, and "third-party" cookies that our third-party business partners and service providers place.

**Local storage technologies**, such as HTML5, provide equivalent services to cookies but can store large amounts of data related to a particular application on devices outside of your browser.

**Web beacons**, also known as pixel tags or clear GIFs, which are used to demonstrate that a webpage or email address was accessed or opened, or that certain content was viewed or clicked.

**Interest-based Advertising**. We, our service providers, and our third-party advertising partners may collect and use your personal information for advertising purposes. Please note, however, that we do not allow our third-party advertising partners to collect this personal information from the Temu mobile application for iOS devices. Our third-party advertising partners may use cookies and similar technologies to collect information about your interaction including data described in the automatic data collection section of the Privacy Policy with the Service, our communications and other online services over time, and use that information to serve online ads that they think will interest you. We may also share information about our users with these companies to facilitate interest-based advertising to those or similar users on third-party platforms. In providing interest-based ads, we follow the Digital Advertising Alliance's Self-Regulatory Principles for Online Behavioral Advertising. See the section below for information on how to limit the use of cookies and similar technologies to process your information for interest-based advertising.

| | |
|---|---|
| (c) wherein the advertisement is correlated with the indicated profile attribute or attributes. | The advertisement of step (a) is correlated with the indicated profile attribute or attributes.<br><br>For example, Temu targets the advertisement directed to the visitor to the second website based on profile data collected as a result of the visitor visiting the first media property, such that the resulting advertisement is correlated with the profile attributes. *See, e.g.*, evidence and analysis for claim limitations 1(a)-1(b); https://www.temu.com/privacy-policy-addendum-for-us-residents.html:<br><br>**▸ The Sale and Sharing of Personal Information**<br><br>Temu uses services that employ cookies and similar technologies to collect Personal Information (including certain identifiers and internet activity information described in the "Collection of Personal Information" section above) about your use of our websites and other online services over time, which helps us to deliver targeted advertisements. In addition, we may share certain categories of Personal Information described in the table of the "Processing of Personal Information" section with our advertising and analytics partners, as well as business and marketing partners with whom we collaborate on marketing events and/or promotion of the Service for targeted advertising purposes. For example, we may share identifiers including your email address and telephone number with our advertising and analytics partners (in hashed form) and business and marketing partners. Our use of some of these services may constitute the "sale" or "sharing" of Personal Information (as defined by the applicable U.S. state privacy laws) to/with third party advertisers. We do not knowingly sell or share (as defined by the applicable U.S. state privacy laws) the Personal Information of minors under 16 years of age.<br><br>; https://www.temu.com/cookie-and-similar-technologies-policy.html:<br><br>**Interest-based Advertising**. We, our service providers, and our third-party advertising partners may collect and use your personal information for advertising purposes. Please note, however, that we do not allow our third-party advertising partners to collect this personal information from the Temu mobile application for iOS devices. Our third-party advertising partners may use cookies and similar technologies to collect information about your interaction including data described in the automatic data collection section of the Privacy Policy with the Service, our communications and other online services over time, and use that information to serve online ads that they think will interest you. We may also share information about our users with these companies to facilitate interest-based advertising to those or similar users on third-party platforms. In providing interest-based ads, we follow the Digital Advertising Alliance's Self-Regulatory Principles for Online Behavioral Advertising. See the section below for information on how to limit the use of cookies and similar technologies to process your information for interest-based advertising.<br><br>; https://www.temu.com/privacy-and-cookie-policy.html: |

**Personalize your experience**

We use your personal information to recommend features, products, and services that may be of interest to you. Personal information will also be used to determine your preferences and personalize your experience with the Service.

; https://help.smartadserver.com/articles/Knowledge/Extended-User-Identification:

**Overview**

User identification across the inventory chain from Supply to Demand is critical to allow for targeting (audience targeting, retargeting etc.), frequency capping and other features.
Traditionally, user identification across the programmatic ecosystems is done by each player dropping a cookie with a unique user id and then synching this id with all other players in the ecosystem.
Since third party cookie based user identification is increasingly blocked by browsers, new providers and initiatives have emerged to allow for cookieless and universal user identification. This article explains Equativ's support of these providers.

**Equativ's extended Ids (eids) support**

To embrace the cookieless user identification era, Equativ follows the Extended Identifiers (eids) specification (see IAB OpenRTB 3.0 specification and IAB AdCOM v1.0 specification). Extended Ids are sometimes referred to as "alternative Ids".

At this time, Equativ supports extended Ids as follows:

- publishers can sign up with a supported user identification provider and send the user Ids in ad calls to Equativ's system; see list of supported providers below in chapter "Logging"
- Equativ logs the presence of a user Id from a supported provider in the ad call and makes it available in the Reporting API as an additional dimension; extended Id statistics are not yet available in the Equativ Monetization Platform
- Smart forwards all `eids` received in the ad calls to the DSPs in the bid requests

; https://adalytics.io/blog/user-id-rotation:

In programmatic advertising, vendors utilize user IDs to build audience profiles and decide how to serve targeted ads. For example, a user with a given user ID might frequent a lot of gardening websites, and consequently, when ad tech vendors "see" that specific user ID, the vendors serve ads to that user ID from advertisers who are promoting gardening tools.

Some user IDs can elicit higher bids from ad tech vendors on behalf of media buyers. For example, a user ID that is thought to be associated with a doctor may elicit very high bid prices from DSPs which are trying to serve ads to healthcare providers on behalf of pharmaceutical brands.